**SOLUTIA, INC., Plaintiff,**

v.

**George H. FORSBERG, et. al., Defendants.**

**Nos. 398CV237RVMD, 399CV168RV.**

United States District Court, N.D. Florida, Pensacola Division.

Aug. 8, 2002.

Alphonse G. Condon, Lewis R. Mills, Richard J. Pautler, Kenneth R. Heineman, Fernando Bernudez, St. Louis, MO, for plaintiffs.

Stephen M. Corse, Miami, FL, Karen J. Ward, Washington, DC, Bryan F. Ayl-stock, Gulf Breeze, FL, Beth D. Jarrett, Charles C. Kline, Eric S. Roth, Miami, FL, Jeffrey S. Endick, Washington, DC, George Everette Day, Fort Walton Beach, FL, Jeremiah A. Collins, Devki K. Virk, Washington, DC, Howard D. Deiner, New York City, Scott L. Rogers, Miami, FL, for defendants.

## ORDER

VINSON, Chief Judge.

This cause comes on for consideration upon the magistrate judge's special master's findings and report and recommendation dated July 17, 2002. The plaintiff has been furnished a copy of the report and recommendation and has been afforded an opportunity to file objections pursuant to Title 28, United States Code, Section 636(b)(1), and I have made a *de novo* determination of those portions to which an objection has been made.

Having considered the report and recommendation and all objections thereto timely filed, I have determined that the report and recommendation should be adopted.

Accordingly, it is now ORDERED as follows:

1. The magistrate judge's special master's findings and report and recommendation is adopted and incorporated by reference in this order.

2. Solutia shall pay to White & Case, LLP, within a reasonable time, the sum of $579,194.16 in full and final payment of all fees and expenses incurred in these consolidated cases.

## SPECIAL MASTER'S FINDINGS AND REPORT AND RECOMMENDATION

DAVIS, United States Magistrate Judge.

The court appointed the undersigned to act as special master in the matter of

attorney fees in these consolidated cases (doc. 1320, 1344). A hearing was held on May 10, 2002, and the parties have submitted additional written argument. I have reviewed and considered the parties' submittals, the evidence adduced at the hearing, and the voluminous pleadings and time records.

A complete recitation of the procedural history of this case is unnecessary. Magistrate Judge Novotny's report and recommendation of August 12, 1999 (doc. 262) described events through that date. Significant subsequent developments were:

1. On October 5, 1999 the court entered a Rule 23(c)(1) Fed.R.Civ.P. order certifying the now lead case, *Solutia v. Forsberg,* case no. 3:98cv237, as a class action (doc. 291).

2. On March 27, 2000 the court consolidated the now lead case with *Baird v. Monsanto,* case no. 3:99cv168 for pretrial proceedings (doc. 337). *Baird* was originally filed in the Eastern District of Missouri on September 4, 1998 and was transferred to this district on March 11, 1999.

3. On May 31, 2001 the court denied plaintiff Solutia's (Solutia) motion for summary judgment as to Class III defendants (doc. 448), and on July 24, 2001 denied Solutia's motion for summary judgment as to Class I defendants (doc. 476).

4. On August 17, 2001 the parties jointly moved for consolidation of *Solutia* and *Baird,* and informed the court that all parties had reached a settlement of all pending issues (doc. 480) and on August 22, 2001 the court ordered that the two cases be consolidated for all purposes (doc. 481).

5. On November 1, 2001, after a fairness hearing pursuant to notice, the court approved the settlement with modifications and entered final judgment (doc. 1296).

## DISCUSSION

Now for resolution is a request for payment of attorney fees and expenses filed by counsel for Classes III–V, White & Case LLP (W & C) (doc. 1305). W & C was also co-counsel for Classes I & II. Solutia rejected W & C's request pursuant to Loc.R. 54.1 (doc. 1326), and W & C rejected Solutia's counter (doc. 1331). W & C seeks fees of $5,300,830.00 and expenses of $205,044.00, for a total of $5,505,874.00.

The standard for determining fees in this case, the lodestar method, was ably discussed by Magistrate Judge Novotny in her report and recommendation of August 12, 1999, subsequently approved by the court. "The first step in computing a reasonable fee is to determine the lodestar, which is the product of the number of hours reasonably worked by a lawyer and a reasonable hourly rate." *Dillard v. City of Greensboro,* 213 F.3d 1347, 1354 (11th Cir.2000). Because the court is guided by equitable principles in determining a reasonable fee, *Durrett v. Jenkins Brickyard, Inc.* 678 F.2d 911, 917 (11th Cir.1982) (citing *Faraci v. Hickey–Freeman Co.,* 607 F.2d 1025, 1028 (2nd Cir.1979)), those principles must necessarily be employed in determining both the reasonable hourly rates to be employed and the number of hours reasonably worked. In keeping with the appropriate standard, I will (1) determine the reasonable hourly rates for the various attorneys and others at W & C who worked on this case, (2) determine the hours reasonably expended in these cases, (3) determine whether a multiplier or other lodestar adjustment is appropriate, and (4) determine what expenses should be paid.

## 1. *Reasonable hourly rate.*

■ Fundamental to Solutia's objection to W & C's hourly rate is the lack of ERISA and class litigation experience of lead counsel, and particularly on the part of Mr. Corse, a partner at W & C, and Mr. Roth, an associate. These two lawyers clocked the majority of the time spent on the cases, approximately 19% and 40% of the total, respectively.[1] Solutia maintains that Messrs. Corse and Roth had literally no ERISA or class litigation experience before taking on this case. This gives Solutia three arguments: (1) Mr. Corse and Mr. Roth are not entitled to hourly rates generally appropriate to ERISA lawyers, (2) W & C failed to present evidence on the appropriate hourly rate for complex litigation lawyers like Messrs. Corse and Roth (to the extent that they are such lawyers), and therefore failed to carry its burden of proof, and (3) W & C is not entitled in either event to national hourly rates, because there are lawyers who handle complex cases such as this one regionally, and W & C did not prove the appropriate hourly rates for such regional lawyers, thereby defeating their claim altogether. While I will ultimately make reductions in the hourly rates recommended for compensation, it will not be for these reasons.

First, when it moved for class certification, four years ago, Solutia (not W & C) told the court that the defendants were well and competently represented, stating:

W[ & ]C is a major New York law firm founded in 1901. It has more than 700 attorneys located in 28 offices around the world, including an office in Miami. It has 160 litigators who routinely handle "big case" litigation involving complex issues and voluminous documents. It also has an employee benefit practice and no doubt has at least several lawyers well-versed in the ERISA issues in this case. Clearly the defendants are well represented by competent counsel.

(Doc. 45, p. 13). Solutia may now regret it endorsed W & C so highly, but it has failed to show that it was wrong in its endorsement. It now seems to accept W & C as a qualified law firm, but argues Messrs. Corse and Roth do not fit the description of "lawyers well-versed in ERISA issues," because they had no ERISA or class action experience. What Solutia told the court in September 1998, however, exactly supports W & C's position. The underlying legal issues in this case were ERISA issues, but this was a "big case" from its inception, appropriate to be handled by "litigators" with access to lawyers "well-versed in ERISA issues."

The affidavit of Mr. Charles Kline (doc. 1305, exh. B, app. 11), a partner at W & C, shows that he is an attorney of more than 30 years experience that includes litigating ERISA claims, and that early in this case he was responsible for selecting the best legal theories to support the defendants, identifying classes and subclasses, developing a plan for gathering evidence, formulating strategies to deal with Solutia's resisting discovery, and developing a proper appellate record. The chart attached to Mr. Kline's affidavit supports this, and Mr. Kline's version of his participation is unrefuted. The time summaries affirm that Mr. Kline clocked half as much time as Mr. Corse in 1998, when the cases were new, but slowly backed out as the legal

---

**1.** These figures are extracted from the time summaries prepared by W & C and attached to doc. 1305, Appendix, tabs 3–10.

issues were set and discovery began in earnest (doc. 1305, Appendix). Mr. Kenneth Raskin of W & C's New York office, also an "ERISA lawyer," similarly assisted Messrs. Corse and Roth (defendant's exh. 1, hearing of May 10, 2002).

I am not unmindful of the necessity of seeing that lawyers are paid only for what they are competent to do, but will not be misled by the attachment of labels where they do not belong. Thus, an "ERISA lawyer," a "class action lawyer," and a "big case or complex litigation lawyer" may be one person, or it may be two or three. As Solutia said early on, W & C has 160 litigators who routinely handle "big case" litigation involving complex issues and voluminous documents and "no doubt" has lawyers well-versed in the ERISA issues in this case. It comes as no surprise that the litigators did the litigating while the ERISA lawyers worked in the background. Solutia has not shown that either Mr. Corse or Mr. Roth was unqualified to do what they actually did in this case. This was a class action, but the question of whether it would be so certified was not really challenged. Once the case was certified, it became just another "big case." To say that Messrs. Corse and Roth should not be considered "ERISA lawyers" or "class action lawyers," and therefore should not be compensated as such, is a red herring.

Also, while it is apparently true that Solutia may not have been aware of Mr. Corse's alleged deficiencies in September 1998, if those deficiencies were so glaring, Solutia must have learned of them since then—hence its claims that Mr. Corse engaged in protracted and unnecessary discovery, and focused on irrelevant issues while Solutia was dragged along—but Solutia did not retract its earlier endorsement of W & C, or inform the court that Mr. Corse was not qualified after all. It argued in opposition to W & C's earlier application for interim fees substantially as it does now, but it did not at any point retract its representation to the court that W & C was qualified to act as class counsel. And as is determined below, the argument that W & C engaged in unnecessary discovery is not supported by the record.

Moreover, the proof here is in the pudding. W & C substantially prevailed in this case. Solutia and the defendants reached a settlement very soon after the motions for summary judgment were denied. Again the polar arguments on the results obtained are, on the one hand, that the settlement was nothing less than a spectacular win for W & C's clients, garnering them $44 million they would have otherwise lost forever, and on the other hand, that the adjustments Solutia conceded in the 2002 plan only marginally improved the defendants' position over what they received in the 2000 plan, which Solutia adopted voluntarily and unilaterally.

It is not necessary to weigh these intangibles too closely. It is unquestioned that Solutia's intent, as set out in its amended complaint, was to have the court "declar[e] that the announced termination of the Plans by Solutia will not violate the terms of such plans or ERISA and that after such termination the Retirees *will not be entitled to receive any benefits under the Plans (whether or not they are entitled to receive any benefits under any replacement plan adopted by Solutia ...)* " (em-

phasis added) (doc. 42).[2] While Solutia obviously intended to and ultimately did voluntarily replace its various plans with the 2000 plan, the amended complaint cannot be read to exclude the possibility that in the future, given a favorable ruling here, it might have terminated any existing plan altogether. Even the settlement notice published to the class members noted that absent a settlement, a victory in the case would give Solutia the right to "terminate the Plan entirely." (Doc. 491, p. 12). Under the terms of the settlement approved by the court, Solutia will be unable to cancel the plan as it sought the authority to do, whatever its current good intentions.

Second, the evidence presented by W & C is sufficient to carry its evidentiary burden. Mr. Sandals testified for W & C at the hearing that he concentrated his practice in ERISA matters, specifically in litigation of retiree medical benefits, among others (doc. 1351, pp. 35–37), and had served as class counsel in three national cases (*id.* at 37). He testified that he had examined the file and sampled the time sheets, and that in his opinion the time spent was reasonable and necessary (*id.* at 41–43), and that the blended rate of $283 [3] was reasonable (*id.* at 48). Although Solutia's counsel objected on foundation grounds, he did not object on the ground that Mr. Sandals was unqualified to state an opinion on the time spent in this case by Mr. Corse or by W & C, or to the reasonableness of the hourly rate, and in either event such an objection would not have been sustained.

Third, the distinction between "national," "regional" and "local" law firms and their hourly rates admits of no bright line. The relevant market for purposes of determining a reasonable hourly rate is the place where the case is filed, and if an applicant wants to recover non-local rates he must show a lack of local attorneys willing and able to handle the case. *ACLU of Georgia v. Barnes*, 168 F.3d 423 (11th Cir.1999). To say that W & C is a major New York law firm with worldwide offices, but should not be paid non-local rates, requires a finding that local counsel could have handled this case. Magistrate Judge Novotny found otherwise, based primarily on the testimony of Mr. Baird, the individual defendant who assisted in interviewing and selecting counsel (doc. 262, p. 7), and Solutia has not rebutted Mr. Baird's testimony.

But Solutia argues that there were regional firms qualified to handle this case, from such cities as St. Louis and Atlanta, and that lawyers from those cities charge lesser rates. That is undoubtedly true, and the rates recommended hereafter are much more closely in line with those rates than with the rates requested by W & C and endorsed by its expert. Yet even some of Solutia's experts describe themselves and their law firms as national, and list cases they have handled which are clearly national in scope and importance (doc. 1327). I reject Solutia's argument that because W & C's expert endorsed only big city rates he failed to testify to skills and services comparable to those of W & C's lawyers.

■ Finally, while a fee applicant has the burden of establishing appropriate

2. Solutia endorsed this interpretation of its amended complaint by approving the proposed notice of settlement, which said that when it commenced this action it sought "a judicial declaration that it had the legal right to amend *or end* [its] plans." (Doc. 491, p. 3) (emphasis added).

3. This will be discussed fully below.

hourly rates, *Coastal Fuels Marketing, Inc. v. Florida Express Shipping Co.,* 207 F.3d 1247 (11th Cir.2000), "the court 'is itself an expert on the question [of fee applications] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value.' ... [W]here documentation or testimonial support is lacking, the court may make the award on its own experience." *Id.* at 1251 (quoting *Norman v. Housing Authority of the City of Montgomery,* 836 F.2d 1292, 1303 (11th Cir.1988)).

■ Having addressed those parts of Solutia's argument that would effectively deny any recovery by W & C, I will now turn to the crux of the reasonable hourly rate issue. Plaintiff's expert testified at the hearing that an appropriate rate for partners in cases of this nature would be $300 to $450 an hour, and that a blended rate[4] of $283 an hour for attorneys is reasonable (doc. 1352, pp. 48–50). Mr. Corse's claimed hourly rate was $330 in 1998 and rose to $370 in 2001. Mr. Roth's rates were $250 and $300, respectively. These rates are significantly in excess of those supported by Solutia's experts, although the latter attorneys appear to represent management interests in most cases. They signed affidavits supporting hourly rates for senior attorneys (those with greater than 15 years experience) of $245 to $305 and for junior attorneys or associates of $120 to $240. Messrs. Corse and Roth's rates are also in excess of the rates agreed to by the law firms who represented the other classes in this case. Those rates ranged from $160 to $250 (doc. 1326, p. 4).

Magistrate Judge Novotny found that a reasonable interim rate for W & C in this case was $250 for partners, $180 for associates, and $60 for paraprofessionals (doc. 262). Her reasoning was that W & C had failed to present sufficient convincing evidence to prove that the rates it sought were reasonable, and further that the application of the well-known *Johnson [v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974)] factors would best be considered at the conclusion of the case. I find that Magistrate Judge Novotny's analysis of the evidence before her applies to the evidence currently before the court. Notably, Mr. Sandals testified that a reasonable hourly rate, based on what other ERISA lawyers are paid in other cases, would be in the range of $300 to $450 (doc. 1351, p. 49). This span is so broad as to be unconvincing. The rate recommended by Magistrate Judge Novotny is at the high end of the rates endorsed by the other experts, and the rates she recommended are more in line with most of W & C's attorneys being compensated as "litigators" rather than the more specialized "ERISA lawyers." The hourly rates attested to by Solutia's experts and the fees agreed to by all the other attorneys in this case more reasonably support the rates endorsed by Magistrate Judge Novotny, and those rates are now found to be appropriate. However, Magistrate Judge Novotny's findings, and the district court's acceptance, are three years old, and need to be adjusted for inflation. The record shows that something over $1.2 million has already been paid, so no inflation adjustment is needed for the bulk of the time. I have therefore determined that the base rates should be the rates adopted by Mag-

4. Under a blended rate arrangement the time for all attorneys who work on a case are billed at a single rate, even though junior attorneys normally bill at significantly lower rates, and senior attorneys normally bill at significantly higher rates.

istrate Judge Novotny, increased by a small amount to adjust for more recent inflation on the unpaid time.[5] The base rates, before making any lodestar adjustments, are therefore found to be $260 for partners, $185 for associates, and $65 for paraprofessionals.

■■■ That does not end the analysis necessary to establish the lodestar hourly rate, however. If the result in the case was excellent, then the court should compensate in the lodestar for all hours reasonably expended. *Norman,* 836 F.2d at 1302 (11th Cir.1988) (citing *Popham v. City of Kennesaw,* 820 F.2d 1570, 1578 (11th Cir.1987)). If the result is partial or limited success, the lodestar is reduced. Id. (citing *Hensley v. Eckerhart,* 461 U.S. 424, 436–37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)). If the results were exceptional, then some enhancement of the lodestar might be appropriate. Id. (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 3098, 97 L.Ed.2d 585 (1987)). The Eleventh Circuit has approved the application of the Johnson factors in determining and adjusting the lodestar rate. *Loranger v. Stierheim,* 10 F.3d 776, 781 (11th Cir.1994); *Norman v. Housing Auth.,* 836 F.2d 1292, 1299 (11th Cir.1988).[6] In addressing the general objections raised by Solutia I have addressed substantially all the Johnson factors. The one factor that stands out as requiring further consideration is the result obtained.

■■ Solutia argues strenuously that the result obtained for the retirees was insignificantly different from what Solutia did for them voluntarily—that the improvement obtained from the court-approved 2002 Plan over the voluntarily adopted (and imposed) 2000 Plan was marginal. I do not accept this argument because it relies on the false assumption that in bringing this action Solutia wanted nothing more than the right to impose the 2000 Plan. As was noted above, Solutia sought much more, and had it been granted all it requested, it would have been given the green light to amend the 2000 plan further, or even to terminate it altogether. Solutia did not ask the court to limit its relief to implementation of the 2000 Plan, but asked for an open-ended license. Its claim that the measure of success in this case is the difference between the two plans is another red herring.

The record shows that there were and are in the neighborhood of 25,000 retirees affected by this case, and while they gave up something and will be required in the future to pay a portion of their medical expenses, they gained the assurance that nothing worse will happen to their medical benefits, and that there will be no more surprises. The exact value of this cannot be determined, but it is significant. As Chief Judge Vinson held in his order approving the settlement

> [T]he consequences of an unfavorable outcome would be severe both for Solu-

---

**5.** I recognize that this indirectly impacts the value of hours for which Solutia has already paid, and I took that fact into account when I made the adjustment.

**6.** The *Johnson* factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the fee custom-

arily charged in the community where the lawsuit is prosecuted, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

tia and for the retirees and their spouses. Whoever lost would lose much more than they are willing to risk, and in some instances more than they are capable of losing. *If Solutia were to prevail completely in this action, it would have the right to terminate substantially all medical benefits for the retirees and their spouses, leaving them without any medical coverage (other than Medicare for those who are eligible).*

(doc. 1299, p. 4) (emphasis added).

Solutia is not bold enough now to assert that its case was a loser from the beginning, such that W & C's efforts were essentially meaningless. There is evidence that these types of cases were being won by employers around the country and that the law was in flux (doc. 1351, p. 44). Chief Judge Vinson found that different courts have decided issues similar to the ones raised in this case in different ways, and that the outcome of the case was uncertain (doc. 1296). The retirees had a realistic chance of losing everything, and Solutia's current intent not to take advantage of such a win is no guarantee of its future actions. Solutia's argument that it had no such intent, wanting only to implement its 2000 Plan, would be cold comfort to those who, as the "extrinsic" evidence tended to show, were promised free lifetime medical coverage, only to have the "free" part taken from them.

Having accepted Magistrate Judge Novotny's base hourly rates, adjusted for inflation since they were adopted in 1999, as appropriate, I find that an upward adjustment is warranted based on the *Johnson* factors, and particularly on the results obtained. I therefore find that the reasonable hourly rate in *Forsberg* for partners is

$285, for associates $205, and for paraprofessionals $65.[7]

■ "In this circuit, when there is a delay [in payment] the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates." *Norman,* 836 F.2d at 1302; *see also Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 923 & n. 41 (3rd Cir.1985) (using current rather than historical rates in determining lodestar can compensate for delay in payment). Therefore, the foregoing rates will be applied for the entire four year period of this case.

Still, I have concern with respect to the *Baird* case. Solutia argues that the *Baird* case was nothing more than a forum shopping effort, and that anything the retirees sought in *Baird* could have been done by way of counterclaim and third party claim in *Forsberg.* A careful review of the *Baird* pleadings, and particularly the transcript of the Rule 16 conference (3:99cv168/RV doc. 50), convinces me that there were issues raised in *Baird* that were necessarily raised in Missouri, but that the majority of the issues raised in *Baird* would ultimately have been resolved in *Forsberg. Baird,* therefore, while not an unnecessary effort, was of significantly lesser importance than *Forsberg.* For that reason, in determining appropriates for *Baird,* I do not make any *Johnson* adjustments to the reasonable hourly rates I find appropriate in *Forsberg.* I therefore find that the reasonable hourly rate in *Baird* for partners is $260, for associates $185, and for paraprofessionals $65.

2. *Hours reasonably expended.*

*Discovery.*

■ Fundamental to Solutia's objection to W & C's fee claim is the amount of time

---

**7.** I find no authority for enhancing lodestar rates for non-lawyers.

spent in discovery. The polar positions on this issue may be stated briefly.

Solutia: W & C spent and wasted an inordinate amount of time in discovery, seeking materials that ultimately were of no consequence. Specifically, in spite of the court's order restricting discovery to the terms of the plan documents, W & C looked high and low for extrinsic evidence interpreting the documents as if the documents had already been found to be ambiguous. Proof of this argument was the court's finding that the plan documents controlled, that all the plan documents were before the court, that the Form 5500s were irrelevant, and that extrinsic evidence would not be considered until the plan documents were found to be ambiguous.

W & C: Solutia stonewalled discovery at every opportunity, produced only what it claimed, falsely, were the correct plan documents, and refused to turn over documents that ultimately proved to be critical to the defense of the case. Proof of this argument was the court's denial of Solutia's motions for summary judgment, and the ultimate favorable settlement of the case. Moreover, discovery consumed only 29% of the time spent in this case.

As is often the case, the truth is undoubtedly somewhere in between. Rather than dissect the discovery process in detail, I make the following general observations:

1. Numerous discovery disputes arose during the course of the case, and Magistrate Judge Novotny entered nine differ-

ent orders addressing the merits of the disputes (docs. 223, 231, 243, 249, 283, 307, 325, 430, 456). W & C and their clients prevailed or substantially prevailed in six of them (docs. 223, 231, 243, 283, 430,[8] 456). Two of the three in which Solutia "prevailed" involved an amendment to allow protection of certain medical information, an issue which was raised late (doc. 307), and clarifying a portion of a protective order, the relevant part of which Solutia had nevertheless earlier approved (doc. 325). This analysis is imperfect, but is likewise not an endorsement of Solutia's claim that discovery was needless. W & C convinced the magistrate judge that discovery was indicated, and that Solutia was resisting. Whether the discovery ultimately led to relevant or admissible documents does not necessarily control whether the discovery should have been sought in the first instance.

2. The court, in denying the motions for summary judgment as to Class III (and later Class I) indeed found that the form 5500s did not prove that there were plan documents that had not been identified (doc. 448, p. 10). That did not mean, however, that it was improper for W & C to do discovery on the documents. The 5500s referred to certain "plans," the names of which did not match any identified plans. The court had earlier authorized discovery of documents that had "any arguable probative value relative to the existence of pre–1986 Plans," finding that the status of the pre–1986 Plans was unclear, and noting that the form 5500s indicated that genuine issues existed (doc. 209). The deposition of Mr. McNichols,

8. In this order Solutia was ordered to produce one document but not so ordered as to two others. However, the order noted that after the relevant motion to compel seeking 45 documents was filed, the parties conferred and Solutia disclosed additional documents and information relative to its privilege log. W & C was thus forced to file a motion to compel to get action.

later referred to by the court in its orders denying Solutia's motions for summary judgment, explained the seeming contradiction, and W & C was unable to unearth any contradictory evidence. That is not to say, however, that W & C should not have tried to find other plan documents, or that W & C's efforts should not be compensated when it was Solutia that chose the language in the 5500s, thereby causing W & C's inquiry.

3. The court also found that the plan documents controlled but were ambiguous on the issue of vesting, and that because of that ambiguity the motions for summary judgment should be denied. It further found that because of the ambiguity, and only because of it, extrinsic evidence could be considered for purposes of determining intent (*id.* at 27). The court then went on to discuss some of the extrinsic evidence already discovered by W & C, including brochures describing lifetime benefits, and the testimony of Solutia's benefit representatives who told retiring employees that their medical coverage was for their lifetimes (*id.* at 27–28). In the context of the court's order, this can most rationally be interpreted as saying there is ambiguity in the plan documents, and here is extrinsic evidence to prove it. That is arguably surplusage, but it is there nevertheless.

4. The events subsequent to the denial of the motions for summary judgment are also very probative. It does not take much experience in the litigation of civil claims to conclude that the quick settlement of this case after the motions for summary judgment were denied was driven in part by the fact that W & C had unearthed this type of evidence, none of which was volunteered by Solutia. The extrinsic evidence may or may not have been of "smoking gun" quality, but it was noteworthy to the district judge, and it certainly goes against Solutia's legal position that it had the right to terminate its plans unilaterally. Solutia's argument that the discovery of extrinsic evidence was wasted effort is not compelling.

Based on the foregoing, and on my review of the entire issue relative to discovery, I reject Solutia's argument that W & C should not be compensated for its discovery efforts.

*Billing generally.*

Much is made by Solutia of W & C's billing. Magistrate Judge Novotny expressed concern in that regard, and specifically about the time recorded by Mr. Kline. Mr. Kline subsequently filed an affidavit explaining his billing entries, and I find it convincing. I have also reviewed the time records in great detail. I note that a tremendous amount of time was spent in prosecuting this case by a large number of timekeepers. However, I cannot say that any entry or series of entries convinces me that they are inflated. While I have in the past found significant overstaffing in cases, this case does not appear to be one in which that occurred. Solutia's argument of wasted effort in addition to discovery, such as Mr. Roth's time spent preparing a motion to compel which was then withdrawn, is illustrative. W & C replies that indeed Mr. Roth spent considerable time on the motion, but that before it was withdrawn Solutia agreed to substantially all that had been asked for, making the withdrawal appropriate, and the record seems to bear this out.

Furthermore, Solutia's supposition that Messrs. Corse and Roth were churning their file because they were short of work is fairly met by W & C's assertion that during the relevant years Mr. Corse was

serving as his office's administrative chief and spent a great deal of time performing administrative tasks, while Mr. Roth was gone from the firm serving as Senator Graham's counsel, and later left the firm for work in the legal department of a firm client.[9] Overall I am satisfied that the time spent in this case was reasonable and was accurately recorded. Magistrate

Judge Novotny likewise did not find duplicative or redundant billing (doc. 262, p. 13). Therefore, and because both parties agree that such is not required, *Loranger, supra,* I have not done a line by line analysis.

Accordingly, I find that the following hourly rates and hours spent are and were reasonable in the two cases, and produce these totals:[10]

*Forsberg*

| | | | | |
|---|---|---|---|---|
| 1. | Partners— | 1889.6 hours | @ $285 = | $ 538,536.00 |
| 2. | Associates— | 4223.8 hours. | @ $205 = | $ 865,879.00 |
| 3. | Paraprofessionals— | 1640.7 hours. | @ $ 65 = | $ 106,645.00 |

TOTAL *Forsberg* $1,511,060.00

*Baird*

| | | | | |
|---|---|---|---|---|
| 1. | Partners— | 156.1 hours | @ $260 = | $ 40,586.00 |
| 2. | Associates— | 871.9 hours | @ $185 = | $ 161,301.00 |
| 3. | Paraprofessionals— | 825.6 hours | @ $ 65 = | $ 53,664.00 |

TOTAL *Baird* $ 255,551.00

LODESTAR $1,766,611.00

*3. Lodestar adjustments.*

 W & C argues for the application of a 2.2 multiplier to the lodestar. The Supreme Court has repeatedly stated that the lodestar "is presumed to be the 'reasonable fee' to which counsel is entitled." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I* ) (quoting *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also*

9. These facts first appeared in the Reply W & C filed after the hearing (doc. 1349). The pleading is signed by Mr. Corse, although it is not in affidavit form. I accept his statements as factual given Mr. Corse's membership in the Florida Bar, his oath as an attorney, and his obligation to represent facts to the court truthfully. The whole issue of why Messrs. Corse and Roth had low billing periods, and why Mr. Roth left the firm, could have been cleared up had W & C been more forthcoming with these particular facts earlier in this round of the case. Had W & C simply produced some proof in this regard Solutia's counsel would not have been in a position that made him feel obligated to accuse Messrs. Corse and Roth, directly or by implication, of churning their file. Mr. Corse says he did not want to dignify the accusation by replying to it, but some things just cannot be ignored. I will add that there has been a disturbing increase in the shrillness in both parties' pleadings. The court is capable of accepting and understanding arguments without the added burden of sifting through personal attacks and counterattacks on each other by counsel and emotionally charged posturing better pitched to a jury.

10. Again, the total hours are taken from W & C's summaries, particularly the summaries at doc. 1305, Appendix, tabs 3–10. I have subtracted from these totals the hours disallowed by Magistrate Judge Novotny: 41 partner hours and 1.5 associate hours (doc. 262, pp. 12–14).

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 728, 107 S.Ct. 3078, 3088, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*); *City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992). Upward adjustments of the lodestar figure are permissible only in "rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts." *Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (internal quotations and citation omitted); *Delaware Valley II, supra,* (citing *Blum,* 465 U.S. at 898–901, 104 S.Ct. at 1548–50); see also *Loranger v. Stierheim,* 3 F.3d 356, 362 (11th Cir.1993). The burden is on defense counsel, as the fee applicant, to establish entitlement to the requested award, including any enhancements. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *Dague,* 505 U.S. at 562, 112 S.Ct. at 2641; *Blum,* 465 U.S. at 898, 104 S.Ct. at 1548–49.

Although there is substantial case law from both the United States Supreme Court and from the Eleventh Circuit on the issue of attorney fees, W & C essentially relies upon three cases in making its argument that the application of a multiplier is both appropriate and warranted.[11] *Wing v. Asarco,* 114 F.3d 986, 987 (9th Cir.1997); *Dutchak v. Central States, Southeast and Southwest Areas Pension Fund,* 932 F.2d 591, 593–94 (7th Cir.1991); and *Bell v. USB Acquisition Co., Inc.,* 734 So.2d 403, 404 (1999). In both *Wing* and *Dutchak,* the parties agreed that the prevailing party's attorney fees would be paid as part of a settlement agreement. At least part of the courts' rationales for awarding or upholding a multiplier in these cases was the risk involved in taking the cases. This was because in each case, the agreement to pay attorney fees was made as part of the settlement agreement, and not before. The Ninth Circuit also considered the quality of representation, the on-going and continuing responsibilities class counsel would have in the case,[12] the quality of the work of class counsel and the results obtained. *Asarco,* 114 F.3d at 988–989.[13] Similarly, the Seventh Circuit considered the immense amount of time that would be devoted to the litigation, that the plaintiff's counsel "sailed into largely unchartered waters," and the public good and benefit served by the results achieved.[14] *Dutchak,* 932 F.2d at 596.

W & C's third case, *Bell,* involved a breach of contract action where the contract at issue provided for the award of attorney fees, but only to the prevailing party. Although there was no independent statutory or rule-based authority for the fee award, the court found it appropriate to use a multiplier as a useful tool in determining a reasonable fee where it was

---

11. W & C also has submitted a chart setting forth "awards of attorneys' fees calculated by application of lodestar plus multiplier" but provides no legal analysis of the listed cases.

12. W & C has not argued that any continuing responsibilities it may have as class counsel would justify a multiplier.

13. A later Ninth Circuit case reviewing a district court's application of a multiplier of less than 1 for poor quality representation noted that quality of representation is generally considered at the lodestar stage in determining what is a reasonable hourly rate. *Van Gerwen v. Guarantee Mut. Life Co.,* 214 F.3d 1041, 1046 (9th Cir.2000). To factor the quality of representation into the multiplier risks double counting, or in that case, a double "penalty."

14. W & C has not argued that the social good obtained by this litigation is a basis to justify a multiplier.

shown that (1) the relevant market required a contingency multiplier to obtain competent counsel; (2) the attorney was unable to mitigate the risk of nonpayment in any other way; and (3) use of a multiplier was justified based on factors such as the amount of risk involved, the results obtained and the type of fee arrangement between attorney and client. *Bell,* 734 So.2d at 412.

W & C argues that in addition to the fact that the settlement agreement in this case independently provides authority for the application of the multiplier, something it is not necessary to determine, there are other compelling reasons why a multiplier should be applied: the results obtained, the risk of non-payment, and the delay in payment.

*Results*

As noted and discussed above, W & C contends that its efforts produced exceptional results, a proposition with which I do not disagree. However, Supreme Court and Eleventh Circuit precedent provides that the quality of the result obtained as well as the risk to the attorney is at least to some extent subsumed in the lodestar. *See City of Burlington v. Dague,* 505 U.S. 557, 567, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Delaware Valley II,* 483 U.S. at 726–27, 107 S.Ct. at 3087–88; *Norman v. Housing Authority of the City of Montgomery,* 836 F.2d 1292, 1302 (11th Cir.1988). I enhanced the reasonable hourly rate in the Forsberg case as stated above, so the result has been taken into account. *Van Gerwen, supra.*

*Risk*

Second, W & C argues that a multiplier is appropriate because the firm subsidized all the fees and expenses in *Forsberg* for over a year and over 50% of the fees after

that, and has yet to receive compensation in *Baird.* W & C contends that the firm faced a significant risk of not recovering the investment it made because the probability of success "was always in doubt." At the same time, W & C states that the multiplier it seeks has been reduced from a higher number than the case law and market data suggest should apply "in order to account for Solutia's agreement that some fees would be paid." (Doc. 1305, tab B at 20).

The Eleventh Circuit has held that multipliers based on contingencies are inapplicable to ERISA cases. *Murphy v. Reliance Standard Life Ins. Co.,* 247 F.3d 1313 (11th Cir.2001). Moreover, Solutia argues that this was not a contingent fee case because W & C had only to bill a reasonable number of hours at reasonable rates and it would get paid, win lose or draw. Thus, the only risk W & C assumed was that it would not be permitted to recover unreasonable and unnecessary fees.

Solutia is absolutely correct. From beginning to end, in no uncertain terms, Solutia undertook to pay the attorney fees and expenses of the retirees. But it did not agree to pay unreasonable fees. "Clearly excessive" fees cannot be charged or collected by Florida lawyers, and a clearly excessive fee is one that "exceeds a reasonable fee for services provided." Rule 4–1.5(a), Rules Regulating the Florida Bar. Solutia's commitment to pay fees was therefore not a blank check. The only unknown with respect to fees was the amount, and the amount would be determined by the relevant law.

W & C's argument that the probability of success was always in doubt is correct as far as it goes, but it points to the

wrong success. The case could have been lost on the merits, but W & C could not have lost its claim for reasonable fees. It will be paid reasonable fees, just as was always promised. When Solutia balked at paying the fees requested, it was appropriate for the court to resolve the issue, but that did not make the payment of fees a matter of doubt. There has never been a contingency relevant to the application of a multiplier.

Moreover, the Supreme Court stated in *Delaware Valley II* that when a party has agreed to pay its attorney, win or lose, the attorney has not assumed the risk of non-payment and there is no occasion to adjust the lodestar fee because the case was a risky one. *Delaware Valley II*, 483 U.S. at 716, 107 S.Ct. at 3082 (citing *Jones v. Central Soya Co.*, 748 F.2d 586, 593 (11th Cir.1984)). That is exactly the case here, except that here a party promised to pay the other parties' fees, win or lose. W & C assumed no risk of nonpayment when it undertook to represent the retirees.

*Delay in Payment*

Lastly, W & C argues that the delay in payment warrants the application of current hourly rates as well as an upward adjustment in order to account for the time value of money, and to compensate for the loss of revenue ordinarily represented by interest on unpaid amounts. I agree that current rates should be applied, and I did so in my earlier recommendation.

Because the benefit to the retirees has been factored into the lodestar, because there was no contingency in this case that impacted on Solutia's obligation to pay W & C's fees, because delayed payment has also been factored into the lodestar, and especially because the law of this circuit prohibits the application of a multiplier in this case even if it were a contingency case, *Murphy*, supra, W & C's request for a multiplier should be denied.

*Expenses.*

W & C requests $205,043.96 for expenses, which fall into the following seven categories:

A. *Computer research.*—$45,504.36.

Magistrate Judge Novotny found that payment for computer research is appropriate in this case, although she reduced the amount awarded because of W & C's failure to be sufficiently specific in how its claim for computer research was broken down. W & C now explains that computer research time is the best proof that research was done, because the file number has to be entered in the computer when the work is done, and the lack of a time entry noting research is undoubtedly an oversight by the timekeeper. Solutia argues in response that Magistrate Judge Novotny was incorrect in her application of the law, but that issue is not reviewable here. Still, Magistrate Judge Novotny reduced the amount of computerized research by approximately one third, and what W & C now says is insufficient to cause reconsideration of her reasoning. Accordingly, the claim for computer research should be approved in the amount of $30,000.00.

B. *Communications/mailing.*— $22,313.02.

This claim is not challenged and should be allowed.

C. *Photocopying.*—$42,011.91.

Magistrate Judge Novotny found that the records submitted by W & C did not

support its claim for copying expenses, and reduced the allowed amount to approximately 50% of the amount claimed. Mr. Corse's explanation of how copying costs were maintained is too imprecise to cause a different result. Accordingly, the claim for copying costs should be approved in the amount of $21,000.00

D. *Travel.*—$25,025.13.

This claim is not challenged and should be allowed.

E. *Court costs/Transcripts.*—$4,283.13.

This claim is not challenged and should be allowed.

F. *Office expenses.*—$5,265.98.

Although challenged only indirectly, Solutia is nevertheless correct that these expenses are so lacking in detail as to be indecipherable. They should be rejected.

G. *Investigations.*—$789.88.

This claim is not challenged and should be allowed.

The total expenses allowed, therefore, should be $103,411.16.

## RECAPITULATION

I have carefully reviewed the pleadings and records in this case, have heard the testimony of the single witness, and have heard and reviewed the oral and written argument of counsel. I largely accept W & C's argument that it achieved a significant result for its clients, but find that the result supports only an adjustment to the reasonable hourly rate, not the application of a multiplier. Given the specific relief that Solutia requested in this action I reject Solutia's argument that the true measure of success in this case is the difference between the 2000 Plan and the 2002 Plan, and I reject Solutia's argument that the time spent by W & C, and particularly the time spent in discovery, was wasteful or unnecessary. I also reject Solutia's argument that W & C, and in particular Messrs. Corse and Roth, were unqualified to perform the services they performed. I find that the hourly rates and the resulting amounts, together with expenses, detailed above are reasonable and were necessarily incurred in the defense and prosecution, respectively, of these cases.

In his sworn application Mr. Corse stated that W & C seeks fees only through the settlement of the case, and seeks no reimbursement for its efforts in collecting its fees (doc. 1305, p. 33). The records considered herein cover the case through settlement.[15]

White & Case LLP is entitled to recover $1,766,611.00 in fees and $103,411.16 in expenses, for a total of $1,870,022.16. The record shows that W & C has already been

---

**15.** W & C may have changed its mind about waiving post-settlement fees given the protracted nature of this proceeding, because it recently filed the records of time and expenses since the settlement. It has not, however, affirmatively indicated that it wishes to withdraw Mr. Corse's waiver. I have not considered whether the waiver could be withdrawn (although I can discern no reliance on Solutia's part that would make the waiver anything other than gratuitous and unilateral), but have treated it as still in force. I will note that even if there had been no waiver, I would be inclined to deny the award of any fees or expenses post-settlement, because in my view the length and intensity of this fee litigation was driven largely by W & C's unsupported demand for a multiplier.

paid $1,290,828.[16] Therefore, Solutia should be ordered to pay to W & C the difference, $579,194.16, in full and final payment of its fees and expenses in these consolidated cases.

Accordingly, it is respectfully RECOMMENDED that the court find that White & Case LLP is entitled to recover $1,766,611.00 in fees and $103,411.16 in expenses, less $1,290,828 already paid, and order Solutia to pay to White & Case, LLP, within a reasonable time, the sum of $579,194.16 in full and final payment of all fees and expenses incurred the these consolidated cases.

July 17, 2002.

---

16. Solutia says it has paid a slightly lesser amount, but W & C's figure will be accepted as correct since it is to W & C's disadvantage to admit to a higher number.